Every spring the Whitewater river and its tributaries overflow their banks and flood these bottoms for miles' around. There have been no floods in the autumn of any consequence, according to plaintiff’s own testimony, but there was a high flood in August, 1875, and another one in August, 1866.
When these waters are up, they spread themselves over the bottoms on the east side of the river, and flow not only underneath the bridge, but also aeross this depression in the pike described above.
.At such times it is impossible to use this pike, which is one of the chief thoroughfares of that part of the country, and the farmers are compelled to make a long detour in order to get around this flooded piece of road. This inconvenience has lasted for very many years, although an act was passed some years ago by the Legislature to enable the county commissioners to raise the level of this pike above the bottom lands, and the money necessary for the improvement has been raised by taxation and is in the treasury.
The plaintiff files his petition in this action asking for an injunction to restrain the county commissioners and the contractor from making the improvement according to the plans and specifications, on the ground that raising the level of the pike will dam up the floods that now flow over the bottoms on the east side of the river and turn this volume of water so that it must either flow under the bridge, or if there is too much of it to escape under the bridge, flow over his land on the west side of the river.
A personal inspection of the premises by the court in company with the attorneys, the plaintiff and other interested parties, together with a consideration of the testimony of the various witnesses, has led the court to the following conclusions:
*172 In the first place, there can be no doubt but that the improvement will be a very great benefit to people living in that part of the country, because, since the burning of Lost bridge, this pike is the only way to get across this valley except by making a very long journey roundabout; and this detour must be made when the pike is flooded.
In the second place, as to the increased flooding of the plaintiff’s land, it is clear that the fill will so dam the waters on the east side of the river as to make the floods rise higher on the west side where the plaintiff’s land is situated. But every witness, including the plaintiff himself, has stated that the floods which come in the spring are never so late as to delay the spring plowing too much, and although the overflowing waters leave large deposits of soil, this mud is dry enough to plow within a few days after the waters recede, and the com ripens before frost. Furthermore, all witnesses agree with great unanimity upon the fact that the richness of this splendid bottom land is due to these annual floods. From all these facts there is room for only one conclusion as to the effect upon the plaintiff’s land of the backing up of additional water upon it in the spring time, and that is that his farm will be improved thereby.
In the next place, a claim has been made that the floods, when backed up by the fill, will flow along the north side of the fill and into the east side of the river, and that a current will thus be thrown against the land of the plaintiff on the western bank below the bridge. It is the opinion of the court that it will be impossible for this water to cut across the current of the main river, which, at high water, will be 500 feet wide (that being the distance between the abutments), so as to wash against the west shore of the river. It must of necessity lose itself in the main current and flow away with it. Of such a fact the court must take judicial cognizance. One who has ever watched the Little Miami river or the Licking river, when they are at flood, pour their yellow waters into the darker Ohio, knows that their currents never succeed in cutting clear across the channel of the main river, but blend with it somewhere about the middle of the Ohio.
*173 Again, it has been claimed that between the west abutment and the west anchor pier, a distance of about fifty-two feet, an extra force of current will be created by the fact, that a large amount of additional water' will be dammed up above the bridge by the proposed fill. As has been said, the space be-, tween these two stone structures is fifty-two feet, and the depth1 of this opening from the floor of the bridge to the ground below is about eighteen feet. Whenever there is a flood now, water flows through this space. Both above and below it there are trees of many years growth, and an examination of the premises shows that the currents so far have added soil around these trees, instead of carrying it away. It seems clear that if the current through this aperture should be increased by the proposed fill, the deposit of earth among these trees would rather be increased than diminished. At any rate, without speculating, the increase of the strength of the current among these trees is not going to do any material injury to the plaintiff’s farm, if it does any.
The claim is made, also, that the water will be dammed up to such an extent that it will.even flow over the pike where it crosses plaintiff’s land on the west side of the river. There is a difference of opinion, and it is difficult to say, as to whether the water will be made to flow over the pike at this point to any extent; but it is hard to see how the plaintiff will be injured even if it does flow over the pike to a considerable extent upon his land. It is hardly likely that there will be enough of it, or that it will be swift enough, to wash his land to the south of the pike; and if it only floods it that will simply be a benefit to it, as has been stated above.
About the law in the case there can hardly be any dispute. The part of the road which it is proposed to fill is in the flood channel of the Whitewater river, according to the definition of a flood channel given in the case of Crawford v. Bambo, 44 O. S., 279; although in holding this it is necessary for this court to find that this flood channel of the Whitewater extends from the hills on the east to the hills on the west, a distance of at least a mile and a half. Although the point at which this fill is to begin, as stated above, is 2,050 feet from the suspension *174 bridge, still that point is a spur of land extending out from the hills into the bottoms like a promontory. On the very point of this promontory, from which the pike descends into the bottoms, is situated Pope’s farmhouse, barns, etc., well above the floods; but on each side of the promontory are the flat bottoms. So the flood channel does not begin where this fill is to begin, but begins at least half a mile further back at the foot of the hills. While it is hard to think of so wide a channel for this river, yet it must be conceded that these wide stretches of territory are the flood channel of the river, according to the Supreme Court decison just cited, and therefore it must be further conceded that the proposed fill will be across the flood channel of the Whitewater. It is further true, without doubt, that diverting the current of a stream so as to overflow the lands of another is a nuisance. 22 O. S., 247; 43 O. S., 623, 627; 44 O. S., 279; 14 C. C., 471.
It is also true that where a riparian owner of land impedes the natural flow of water by filling such portion of his land as is covered by the flowing waters of the stream even at flood stage, and thus injures the land on the opposite bank of the river, an injunction is the proper remedy to prevent the wrong. City of Dayton v. Robert, 8 C. C., 649.
Conceding all of these points, the injury which the proposed change will probably cause must be of a material sort, that is, resulting in damage of a substantial nature. Merely nominal damage is not of this sort, and in this case, even conceding that all of the law is in favor of the plaintiff, there has been no showing that, either from currents or increased floods, there will be any material injury done to the plaintiff’s farm. It is not unlikely, as pointed out above, that the increased floods will even confer benefit on his land, while the increase in currents will do him no damage.
It may be that some day, if this fill be made, the plaintiff will have grounds for an action at law because of damage to his property which can not be foreseen at this time; but between an important public improvement on the one hand, and the very doubtful prospect of injury to the plaintiff’s land on the other, a court of equity, which may always use its discretion *175 in such cases, ought not to enjoin the public improvement, but should leave the plaintiff to his rights at law.
C. E. Avery, S. K. Eenshaw, for plaintiff.
W. R. Collins, Chas. F. Dolle, for defendants.
Injunction will be refused.